# United States Court of Appeals

## For the First Circuit

Nos. 11-1089
    11-1091

JUAN C. PAGÁN-COLÓN; ADA I. RENTA-BONILLA;
CONJUGAL PARTNERSHIP PAGÁN-RENTA,

Plaintiffs, Appellees, Cross-Appellants,

v.

WALGREENS OF SAN PATRICIO, INC.,

Defendant, Appellant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Gregory T. Usera, with whom Natalia Villavicencio and Usera,
Figueroa & Giner, P.S.C. were on brief, for appellant.
    Jorge Martínez-Luciano, with whom Alfredo Acevedo-Cruz was on
brief, for appellees.

September 4, 2012

**LIPEZ**, **Circuit Judge**.    This case arises from the termination of the plaintiff-appellee, Juan Pagán-Colón, from his job as an assistant manager at a Walgreens store in Juana Díaz, Puerto Rico.  Although the parties disagree as to the reason for Pagán's termination, there is no dispute that he was fired after a two-week absence from his job due to a medical condition that required one week of hospitalization and another week of recuperation.  Following Pagán's termination, he and his wife, Ada Renta-Bonilla, brought claims in federal district court against Walgreens alleging that he was fired in retaliation for conduct protected by the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54; that his termination was wrongful under Puerto Rico law; and that the loss of Pagán's job caused Renta to suffer emotional distress compensable under Puerto Rico law.  After the district court granted summary judgment for Walgreens on Renta's claim and the plaintiffs voluntarily dismissed the other Puerto Rico law claim, the FMLA claim went to trial and a jury found in Pagán's favor, awarding compensatory damages.

On appeal, Walgreens argues that it was entitled to judgment as a matter of law on the FMLA claim and that the district court erred in denying a Federal Rule of Civil Procedure 59(e) motion to amend the judgment.  In turn, Pagán and Renta argue that the court erred in denying liquidated damages on the FMLA claim and

in granting Walgreens summary judgment on Renta's Puerto Rico law claim.

For the reasons described below, we affirm the judgment of the district court in all respects, save its rejection of Renta's Puerto Rico law claim. That claim presents an important and unresolved issue of Puerto Rico law that we decline to address in the first instance. Accordingly, we certify the question to the Supreme Court of Puerto Rico and reserve judgment on this particular issue pending its response. Additionally, as a matter of first impression, we conclude that a backpay award under the FMLA may include overtime compensation.

**I.**

## A. Factual Background

As we are called upon to review the denial of a motion for judgment as a matter of law, we review the evidence "in the light most favorable to the verdict" in favor of Pagán. Alvarado-Santos v. Dep't of Health, 619 F.3d 126, 132 (1st Cir. 2010).

### 1. Pagán's Hospitalization and Discharge

Pagán began working for Walgreens in September 2000. By the time of his discharge in 2008, he had been promoted to assistant manager of the Walgreens store in Juana Díaz. On May 10, 2008, Pagán reported for work at 4 a.m., but shortly thereafter he began to experience chest pains, heart palpitations, and sweating. His symptoms worsened that morning, and during his 9 a.m. break he

went to the emergency room at a local hospital. Already suffering from type II diabetes, he was found to have high blood sugar and high blood pressure, and he asked hospital staff to contact his wife, Renta.

When Renta arrived, Pagán asked her to contact Edwin Figueroa, the manager of the store at which he worked, and tell Figueroa that he was in the hospital and unsure when he could return to work. She did so immediately after leaving the emergency room at approximately 10 a.m. She also called the store twice more that day to give updates on Pagán's condition and inform those at the store of his admission to the hospital. Pagán was hospitalized from May 10 to 17, and he underwent a cardiac catheterization surgical procedure on May 16. During his hospitalization, he was in contact with co-workers, including another assistant manager whom he told of his upcoming surgical procedure.

Pagán was discharged from the hospital on May 17. That day, he went to the Walgreens store at which he worked to pick up prescription medication and deliver a medical certificate explaining his absence. He met with assistant manager Mariel Colón, who was the most senior employee present at the time, and bookkeeper Wanda Santiago. During this meeting, he told Colón that his doctors had ordered him to rest at home for one week and he presented the medical certificate to Santiago, a fact verified by that day's surveillance video footage from the store and stipulated

by the parties at trial.  However, Figueroa, the store's manager, testified that news of Pagán's hospitalization, physician-ordered recuperative rest, and delivery of the medical certificate was not communicated to him.

### 2.  Pagán's Termination

After consultation with the Walgreens district supervisor and corporate legal counsel, Figueroa sent a letter dated May 19 to Pagán, stating that he had not heard from Pagán and had no explanation for his extended absence.  The letter asked that Pagán contact Walgreens management to determine his eligibility for disability leave, and stated that if he did not do so within 48 hours there might be "negative consequences for [his] job."  Pagán did not receive this letter until May 28,[1] well after the expiration of the 48-hour deadline, and Figueroa never called Pagán or made any other attempt to get in touch with him.  On May 23, having not heard from Pagán, Figueroa again consulted with the district supervisor and legal counsel, and the decision was made to terminate Pagán's employment with the understanding that he had abandoned his job.

Unaware of this decision, Pagán went to the store that same day to let others know that he was available to return to work the following day and to determine what his work schedule would be.

---

[1] Although the letter was dated May 19, Figueroa testified that he did not mail the letter until sometime on or after May 23.

-5-

He spoke with assistant manager Ivelisse López, who agreed to speak with other managers and let Pagán know when she learned of his schedule. After Figueroa became aware of Pagán's visit, he asked López to contact Pagán with instructions to come into the store to meet with him at 8 a.m. the following day. When Pagán came to work on May 24, Figueroa told him that he was fired and asked him to return his keys to the store. Figueroa offered no explanation for the termination. When Pagán asked for one, Figueroa simply told him to contact Walgreens' corporate offices. After trying unsuccessfully for several days to contact someone at Walgreens' corporate offices by phone, Pagán went to the office in person and was able to meet with Miriam Díaz of Walgreens' Human Resources Department. Díaz was also unable to explain his termination, but she said that she would look into the matter and give Pagán an answer.

Upon realizing that Pagán had documentation of his hospitalization and doctor-ordered rest, Figueroa, in consultation with the Walgreens district manager and Walgreens legal counsel, decided to reconsider his termination. On June 3, Figueroa called Pagán to ask him to come to the store to be interviewed. The next day, Pagán met with Figueroa and another Walgreens employee and described to them the circumstances of his hospitalization and attempts to notify Walgreens of his absence. After this meeting, Figueroa attempted to verify Pagán's account by talking with the

Walgreens employees that Pagán claimed that he or his wife had contacted. According to Figueroa, at least one individual that Pagán claimed his wife had contacted had no recollection of the call, and neither of the individuals that Pagán met with on May 17 recalled receiving a medical certificate from him. Accordingly, Figueroa concluded that Pagán had lied to him during the investigation and, again in consultation with the district manager and legal counsel, Figueroa decided to terminate Pagán for his dishonesty -- a decision that Walgreens insists was entirely independent of Pagán's hospitalization and related absence. Accordingly, on June 6, Pagán was notified that his termination was confirmed, but the basis was changed from his two-week absence to his alleged dishonesty during the investigation.

## B. Procedural History

Shortly after his discharge, Pagán and his wife filed a complaint against Walgreens in the United States District Court for the District of Puerto Rico. They raised several claims, including: 1) retaliation under the FMLA, 2) wrongful termination in violation of Puerto Rico Law 80, P.R. Laws Ann. tit. 29, §§ 185a-185m, and 3) damages under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-5142. The district court granted summary judgment for Walgreens on the Article 1802 and 1803 claims, and the plaintiffs voluntarily

dismissed their Law 80 claim during the course of the trial. Accordingly, only the FMLA claim was submitted to the jury.

At the close of evidence, Walgreens moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, but the court denied the motion and submitted the case to the jury. The jury rendered a judgment in favor of Pagán, awarding him $100,000 in damages. Sua sponte, the court ordered remittitur, reducing the award to $47,145 to match Pagán's estimated lost wages (including overtime) and account for earnings at a new job that mitigated damages. The court also denied Pagán's request for additional liquidated damages under the FMLA.[2] Finally, the court considered dueling Rule 59(e) motions to amend the judgment. It allowed Pagán's motion to grant prejudgment interest on the award, but denied Walgreens' motion seeking to eliminate or reduce the overtime pay included in the damages award.

On appeal, Walgreens challenges the district court's denial of its Rule 50 and 59(e) motions. With regard to the former, it argues that Pagán presented insufficient evidence at trial to establish its liability under the FMLA. On the latter, it argues that it is entitled to an amended judgment because back pay for overtime is not available under the FMLA and, even if it is,

---

[2] As discussed below, the FMLA provides that a plaintiff is entitled to liquidated damages unless the defendant is able to show that its violation of the statute "was in good faith and that [it] had reasonable grounds for believing that the act or omission was not a violation of [the FMLA]." 29 U.S.C. § 2617(a)(1)(A)(iii).

-8-

the court's award in this case is excessive.  In turn, Pagán and his wife have cross-appealed, arguing that the district court erred in denying their request for liquidated damages and in granting Walgreens summary judgment on their Article 1802 and 1803 claims.

## II.

## A.  Rule 50 Motion for Judgment as a Matter of Law

### 1.  Legal Framework

We review the denial of a Rule 50 motion for judgment as a matter of law de novo.  Alvarado-Santos, 619 F.3d at 132.  In doing so, we view the evidence "in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury."  Id.  Thus, "our review is weighted toward preservation of the jury verdict because a verdict should be set aside only if the jury failed to reach the only result permitted by the evidence."  Analysis Group, Inc. v. Central Fla. Invest., Inc., 629 F.3d 18, 22 (1st Cir. 2010) (quoting Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006)) (internal quotation marks omitted).

Here, the jury had to determine whether Walgreens had retaliated against Pagán for conduct protected by the FMLA.  We have previously explained that, among other things, the FMLA prohibits retaliation against employees who take FMLA leave.  See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331

(1st Cir. 2005).  In particular, interpretive regulations provide that

> [a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave.  For example, . . . employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies.

29 C.F.R. § 825.220(c); see also Colburn, 429 F.3d at 331, 331 n.2 (noting that, although the FMLA does not explicitly reference "retaliation," such a prohibition is implicit in the statute and universally recognized).  Accordingly, a crucial component of an FMLA retaliation claim is some animus or retaliatory motive on the part of the plaintiff's employer that is connected to protected conduct.  See Colburn, 429 F.3d at 335; Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998).

Thus, to make out a prima facie case of retaliation, a plaintiff must show that: 1) he availed himself of a protected right under the FMLA, 2) he was adversely affected by an employment decision, and 3) there was a causal connection between the protected conduct and the adverse employment action.  See Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 113-14 (1st Cir. 2006); Colburn, 429 F.3d at 335.  Where the plaintiff provides no direct evidence of retaliation, we have relied on the burden-shifting framework established by the Supreme

Court in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973).  As
we have explained,

> [u]nder that framework, a plaintiff employee
> must carry the initial burden of coming
> forward with sufficient evidence to establish
> a prima facie case of . . . retaliation.  If
> he does so, then the burden shifts to the
> employer "to articulate some legitimate,
> nondiscriminatory reason for the employee's
> [termination]" . . . .   If the employer's
> evidence creates a genuine issue of fact, the
> presumption of discrimination drops from the
> case, and the plaintiff retains the ultimate
> burden of showing that the employer's stated
> reason for terminating him was in fact a
> pretext for retaliating against him for having
> taken protected FMLA leave.

<u>Hodgens</u>, 144 F.3d at 160-61 (quoting <u>McDonnell Douglas</u>, 411 U.S. at
802).

### 2.  **Denial of Walgreens' Rule 50 Motion**

Walgreens argues that it provided a valid non-discriminatory reason for Pagán's termination and thus, under the <u>McDonnell Douglas</u> framework, it was Pagán's burden to show that this stated reason was in fact pretextual.  According to Walgreens, Pagán failed to introduce sufficient evidence at trial to permit the jury to find that its stated reason for the termination was false and the real reason was retaliation.  This argument is unpersuasive.

Walgreens offered two rationales for Pagán's termination. Initially, it determined that Pagán had abandoned his job.  After reconsidering its decision, it determined that Pagán should be

-11-

terminated because of his dishonesty during its investigation. Even if we accept that each of these explanations was, on its face, a valid non-discriminatory reason for Pagán's termination, there was sufficient evidence to permit the jury to reject both rationales as pretext.

With regard to Pagán's supposed abandonment of his job, Figueroa testified that after learning that Pagán left work to go to the hospital on May 10, he heard nothing about Pagán's hospitalization, surgery, or physician-ordered recuperative rest until May 23. However, there was extensive evidence that Pagán put his employer on notice of his condition, including evidence that he: 1) made repeated efforts to contact his employer on the day that he entered the hospital, 2) was in contact with co-workers throughout his hospitalization, 3) went to the store at which he was employed on the day of his discharge and told the most senior manager there that he would be out for another week, 4) provided a certificate from his physician explaining his hospitalization and the need for recuperative rest, and 5) made an effort to determine his work schedule on the day before his week of physician-ordered rest ended.

Furthermore, the fact that Figueroa's May 19 letter to Pagán provided only forty-eight hours to contact a Walgreen's manager, and was not mailed until it was too late for Pagán to act within the deadline, is also suggestive of pretext. Finally, the

close temporal proximity between Pagán's FMLA-protected leave and his termination suggests a causal connection between the two. While temporal proximity on its own is insufficient to establish pretext, it is relevant evidence that, combined with other facts, may support such a finding. See Hodgens, 144 F.3d at 168. The jury was entitled to rely on this evidence in aggregate to determine that, his testimony notwithstanding, Figueroa was aware that Pagán had not abandoned his job and that this explanation was pretextual.

Walgreens' second explanation -- that Pagán was dishonest during its investigation -- is similarly susceptible to attack. Although Walgreens points to inconsistencies in Pagán's statements and one alleged attempt to persuade a co-worker to cover for him by giving the company a false statement,[3] this evidence did not compel a jury to find that dishonesty was the basis for his termination. Importantly, Walgreens presented evidence that the decision to terminate Pagán for dishonesty was based, in large part, on Pagán's statement to Figueroa that he gave a co-worker a medical certificate explaining his absence when he visited the store on May 17, and Figueroa's inability to find evidence of this hand-off on the security camera footage from that day. However, at trial,

---

[3] Walgreens asserts that, during its investigation, Pagán called a potential witness and asked him to remember that Pagán's wife had called to inform him of Pagán's hospitalization. The employee stated that he did not receive such a call and notified investigators of Pagán's call to him.

-13-

Walgreens stipulated that the security camera footage does, in fact, show Pagán giving a document to a co-worker, and no explanation is given for this discrepancy.

Furthermore, Walgreens argued that Pagán initially said he handed the certificate to Colón, the assistant manager he met with that day, when he actually gave it to Santiago, the other employee present at the meeting. Walgreens sees in this inconsistency proof of Pagán's dishonesty. But it was reasonable for the jury to conclude that this inconsistency was not proof of dishonesty. More importantly, on this evidence, a reasonable jury could conclude that Walgreens' explanation that Pagán was dishonest was pretextual.

Finally, Walgreens' shifting explanations also support the jury's verdict. We have noted that "[o]ne way [to establish pretext] is for the plaintiff to show that the employer gave different and arguably inconsistent explanations for taking the adverse employment action." McDonough v. City of Quincy, 452 F.3d 8, 18 (1st Cir. 2006) (quoting Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000)) (internal quotation marks omitted). This case is an archetypal example of this phenomenon. Here, Pagán was initially given no explanation for his termination, despite repeated inquiries. By his own persistence, he eventually obtained an explanation that he was terminated because his supervisors had determined that he abandoned his job.

Subsequently, after it became clear that Pagán could show that no such abandonment occurred, Walgreens changed the basis for his termination to his supposed dishonesty during its investigation of his two-week absence. The jury could reasonably have deemed these shifting explanations to be a red flag suggesting that Walgreens' decision to dismiss Pagán was motivated by retaliatory animus.

In summary, for all of the reasons described, there was sufficient evidence to permit the jury to conclude that Walgreens' explanations of its reasons for firing Pagán were pretextual. Walgreens was not entitled to judgment as a matter of law.[4] See Alvarado-Santos, 619 F.3d at 132.

## B. Rule 59(e) Motion to Amend the Judgment

In ordering remittitur, the court determined the amount of Pagán's lost wages, including $20,637 in overtime pay. The court calculated the amount of overtime pay that Pagán was due by estimating that he would have worked 6.5 hours of overtime per week over the 125-week period between his termination and the judgment. It obtained the 6.5 hours per week figure by looking to the year-

---

[4] We affirm the court's denial of Walgreens' Federal Rule of Civil Procedure 59(a) motion for a new trial for the same reason. The denial of a motion for a new trial is reviewed for abuse of discretion. Cortés-Reyes v. Salas-Quintana, 608 F.3d 41, 48 (1st Cir. 2010). Such a motion may be granted "only if the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice." Id. (internal quotation marks omitted). As described, the jury's verdict in this case was amply supported by the evidence. Thus, the court did not abuse its discretion in denying Walgreens' Rule 59(a) motion.

to-date average of Pagán's weekly hours during the months prior to his termination (i.e., the period from January 1, 2008, until Pagán's termination in May 2008), which was 46.5 hours. However, the parties stipulated that during the 12-month period prior to Pagán's termination he had worked an average of 43.5 hours per week. Thus, the court implicitly assumed that the year-to-date average was more reliable than the 12-month average for determining how much overtime Pagán would have worked going forward if he had not been terminated. Walgreens argues that the computation of lost compensation under the FMLA should not include overtime pay, and that, even if it does, the district court should have used the lower estimate of overtime hours based on the 12-month average rather than the year-to-date average.

A district court's resolution of a motion to amend the judgment is ordinarily reviewed for abuse of discretion. Negrón-Almeda v. Santiago, 528 F.3d 15, 25 (1st Cir. 2008). However, abstract questions of law presented by such a motion are reviewed de novo. Id. We have previously held that "[r]eview of the legal principles used by the district court in determining the availability of back pay is de novo." Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 381 (1st Cir. 2004).

**1.  Availability of Overtime Backpay Under the FMLA**

Although we have not previously addressed the issue, we see no reason why overtime pay should not be included in an award

of backpay under the FMLA. The FMLA provides that an employee may recover "any wages, salary, employment benefits, or other compensation denied or lost . . . by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I). Overtime certainly falls into the category of "other compensation." This conclusion is consistent with the way in which damages are calculated for violations of other employment laws, as "back-pay awards often include payment for overtime work that an employee would have performed but for her employer's violation of employment laws." Ricco v. Potter, 377 F.3d 599, 605 (6th Cir. 2004); see also Fryer v. A.S.A.P. Fire & Safety Corp., 658 F.3d 85, 93 (1st Cir. 2011) (Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4311 et seq.); Alexander v. Milwaukee, 474 F.3d 437, 452 (7th Cir. 2007) (Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.); Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1157 (9th Cir. 2001) (Worker Adjustment Retraining and Notification Act, 29 U.S.C. §§ 2101 et seq.).

Walgreens offers no authority for the proposition that backpay for overtime is categorically unavailable to a successful FMLA plaintiff. Contrary to its suggestion, the Eighth Circuit did not find in Torson v. Gemini, Inc., 205 F.3d 370 (8th Cir. 2000), that overtime backpay was categorically unavailable. Instead, based on the facts of that case, it found that it was too

-17-

speculative to award.  Id. at 384.  Accordingly, we decline to read such a limitation into the FMLA where, first, the plain language of the statute suggests that backpay for overtime is available, and, second, such a limitation would be inconsistent with our treatment of violations of other employment laws.

### 2. The Court's Estimate of Pagán's Overtime

Whether overtime backpay is categorically available under the FMLA is a question of pure law; in contrast, our review of the amount of the district court's award presents a factual question. Accordingly, we review the court's decision to calculate Pagán's backpay award using the estimate of 6.5 overtime hours per week for clear error.  See Hernández-Miranda v. Empresas Díaz Massó, Inc., 651 F.3d 167, 170 (1st Cir. 2011).

As noted, the 6.5 overtime hours per week estimate was based on the year-to-date average of the number of overtime hours per week that Pagán worked in 2008 before his termination.  In its written decision denying Walgreens' Rule 59(e) motion, the court explained that this figure was based on pay stubs admitted into evidence and Pagán's trial testimony.  It also noted that Walgreens had presented no evidence contrary to its finding that Pagán had worked an average of 46.5 hours per week in 2008 prior to his termination.  This year-to-date average included five months of data -- a reasonably large sample size -- and it was not clear error for the court to assume that this was a more accurate

indicator of the number of overtime hours that Pagán would have worked going forward than the 12-month average suggested by Walgreens. Accordingly, we will not disturb the court's calculation of the amount of backpay due Pagán.

**III.**

**A. FMLA Liquidated Damages**

After the jury rendered a verdict in favor of Pagán, the court denied his request for liquidated damages. The FMLA provides that in addition to lost wages, an employee "shall" recover

> an additional amount as liquidated damages equal to [lost wages and interest], except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, [decline to award liquidated damages].

29 U.S.C. § 2617(a)(iii). Thus, an employer must prove both "good faith" and "reasonable grounds" to escape liquidated damages, and the decision of whether to award liquidated damages is left to the court. Because the employer bears the burden of proof, the statute creates a "strong presumption in favor of awarding liquidated damages." Thom v. Am. Standard, Inc., 666 F.3d 968, 976 (6th Cir. 2012).

Considering Pagán's request for liquidated damages, the court found that, notwithstanding the jury's verdict, Walgreens

acted in good faith and had reasonable grounds for its termination of Pagán.  In reaching this conclusion, the court explained that "for purposes of the case, there's two fact finders; there's the jury for the liability . . . [a]nd then there's the judge as a fact finder for purposes of the liquidated damages."  It reasoned that Pagán's termination was a "rookie mistake" by Figueroa, who had been a manager for only one month at the time.  Furthermore, the court looked to the letter sent to Pagán, Figueroa's consultation with legal counsel, the company's reconsideration of Pagán's termination, and the fact that Pagán received pay for the two weeks he was out as evidence of Walgreens' good faith.

On appeal, Pagán argues that the court did not have the discretion to deny liquidated damages given the jury's verdict.  He asserts that the jury necessarily found that Walgreens did not act in good faith in terminating him and that the court was bound by this finding.[5]  Alternatively, Pagán argues that the court improperly determined that Walgreens acted in good faith and, furthermore, erroneously focused only on good faith, ignoring the second part of the analysis -- whether Walgreens had reasonable grounds for believing Pagán's termination did not violate the FMLA.

---

[5] The court's instructions to the jury stated that an employer is not liable for retaliation under the FMLA where it has "an honest, good faith belief for termination, even if it turns out that the employer was mistaken in that belief."  Furthermore, the verdict form asked whether the plaintiff had proven by a preponderance of the evidence that "Walgreen's proffered reason for the discharge was not legitimate and non-discriminatory."

-20-

We will not entertain Pagán's argument that the district court lacked discretion in this case to deny him liquidated damages because the jury necessarily found that Walgreens did not make its termination decision in good faith. Pagán did not make this argument to the district court. In fact, he acknowledged to the court that he believed that it did have the discretion to make an independent determination of good faith, the jury's verdict notwithstanding. At a post-verdict hearing addressing the issue of liquidated damages, the court repeatedly emphasized that it understood there to be "two fact finders" and that it "[could] make a finding of reasonable grounds to terminate, and it would not set aside the jury verdict but it would be for purposes of the liquidated damages provision that I make this finding." Pagán did not object to this description of the court's discretion. In fact, he stated that "it has been our position that this ruling, whether or not you will accept defendant's defense against liquidated damages, is something that is left to the sound discretion of the court." Furthermore, in a post-verdict motion, Pagán explained his decision not to raise the liquidated damages issue by noting that "the [court's] decision on the employer's affirmative defense to liquidated damages is discretionary in nature." The motion goes on to repeatedly emphasize that the district court has discretion to deny liquidated damages and never raises the concern that the fact-

finding necessary to deny liquidated damages is inconsistent with the jury's verdict.[6]

The motion also states that Pagán's decision not to contest the denial of liquidated damages should "not . . . be understood as a waiver of his right to bring up the matter on appeal."  However, given Pagán's characterization of the court's authority to award liquidated damages as "discretionary," this reservation was plainly intended to cover only Pagán's ability to contest the merits of the court's determination of good faith, not its discretion to make this finding.  We will honor Pagán's reservation by taking up the second argument he raises -- that the court erred in finding that Walgreens had reasonable grounds for believing Pagán's termination to be lawful.  But Pagán may not now raise the issue of the court's ability to make that finding after having repeatedly acknowledged its discretion to do so.  See United States v. Taylor, 511 F.3d 87, 91 (1st Cir. 2007) ("Absent extraordinary circumstances, it is a bedrock rule that when a party has not presented an argument to the district court, he may not

---

[6] In its reply brief, Walgreens highlights Pagán's failure to make this argument to the district court.  It states: "Not only is the [decision to] award . . . liquidated damages reserved to the court . . . , but Plaintiffs admitted as much during trial, when asked who should make the liquidated damages determination and eventually both parties agreed [that the court had discretion to do so]."  Walgreens also notes: "During post-trial proceedings, the Court was very specific in its ruling that the finding of the jury was for liability but that the Court's ruling was an independent finding for liquidated damages -- and neither party objected to this standard of analysis."

unveil it in the court of appeals." (internal quotation marks omitted)).

Accordingly, we turn to Pagán's second argument -- that, in denying liquidated damages, the district court improperly found that Walgreens acted in good faith and erred by failing to consider whether Walgreens had reasonable grounds for believing Pagán's termination to be lawful. We review the district court's decision to deny liquidated damages for abuse of discretion. See Chao v. Hotel Oasis, Inc., 493 F.3d 26, 35 (1st Cir. 2007) (reviewing decision to award liquidated damages under the FLSA).[7] However, "we review the district court's factual findings related to good faith and reasonableness for clear error." Id. (citing McLaughlin v. Hogar San José, Inc., 865 F.2d 12, 14 (1st Cir. 1989)). As we have explained, a clear error exists "only if, after considering all the evidence, we are left with a definite and firm conviction

---

[7] We may look to decisions interpreting the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-19, for guidance on the liquidated damages provisions of the FMLA because "[the FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA . . . [and] [t]he relief provided in the FMLA also parallels the provisions of the FLSA." S. Rep. 103-3, at 35 (1993); see also Frizzell v. Sw. Motor Freight, 154 F.3d 641, 644 (6th Cir. 1998) ("[T]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA."). The relevant portions of the FLSA's liquidated damages provision are similar to the FMLA's: "if the employer shows to the satisfaction of the court that [it acted] in good faith and that [it] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260.

-23-

that a mistake has been made."  United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011).

"To establish good faith under the FMLA, a defendant must show that 'it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it.'"  Thom, 666 F.3d at 977 (quoting Hite v. Vermeer Mfg. Co., 446 F.3d 858, 868 (8th Cir. 2006)); see also Barfield v. N.Y. City Health & Hosp. Corp., 537 F.3d 132, 150 (2d Cir. 2008) (noting that good faith requires "active steps to ascertain the dictates of the FLSA and then act to comply with them" (internal quotation mark omitted)).  Thus, an employer will be liable for liquidated damages where it "'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'"  Chao, 493 F.3d at 35 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).  An employer may advance its good faith and reasonable grounds showings by demonstrating that it sought legal advice about its obligations under the FMLA.  See Cooper v. Fulton Co., 458 F.3d 1282, 1287 (11th Cir. 2006) (finding no reasonable grounds for believing termination lawful where employer failed to seek legal advice); Hoffman v. Prof'l Med. Team, 394 F.3d 414, 419-20 (6th Cir. 2005) (same).  Additionally, the fact that an employer met with an employee to determine eligibility for FMLA leave may be indicative of good faith.  See Hoffman, 394 F.3d at 419-20.

-24-

Here, the transcript of the hearing on liquidated damages belies Pagán's assertion that the court did not consider whether Walgreens had reasonable grounds for believing its actions to be lawful.  In stating its decision, the court explained: "for purposes of this motion at this time, . . . I understand Walgreens acted with reasonable grounds."  Furthermore, although the evidence was mixed, the court's finding of good faith and reasonable grounds was not so divorced from the evidence as to constitute clear error.

Figueroa consulted with a Walgreens attorney several times to understand the company's legal obligations and obtain guidance in how to proceed.  Additionally, Figueroa's initial letter to Pagán invited him to apply for disability leave.  The company reconsidered its termination decision after Pagán raised the issue with a human resources supervisor.  Perhaps most significantly, there was ample evidence of communications breakdowns at the Juana Díaz store that prevented Figueroa and the other managers who made the decision to terminate Pagán from learning of the facts of his hospitalization and absence in a timely manner.  For whatever reason, the medical certificate that Pagán provided on May 17 was not passed along to Figueroa, nor was Pagán's notice that he would be absent for another week on doctor-ordered recuperative rest.  Although it is undisputed that Figueroa was aware of Pagán's initial visit to the emergency room, the court could rely on this evidence to conclude that he did not know of the

full extent of Pagán's illness and was genuinely confused by Pagán's two-week absence.

In short, given the high hurdle posed by the clear error standard, Pagán's challenge to the court's findings is unavailing. See United States v. Matos, 328 F.3d 34, 40 (1st Cir. 2003) (noting that, although another fact-finder may have differed, where a finding is plausible there is no clear error).

## B. Renta-Bonilla's Article 1802 Claim

As noted, Pagán's wife, Ada Renta-Bonilla, brought a claim in the same action under Puerto Rico's Article 1802, P.R. Laws Ann. tit. 31, § 5141.[8] Article 1802 is Puerto Rico's general tort statute, providing that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." Id. The Supreme Court of Puerto Rico has held that, in certain circumstances, relatives of a person who has been the victim of workplace discrimination may bring claims under Article 1802 to be compensated for any harm to them resulting from the discrimination. Santini Rivera v. Serv. Air, Inc., 137 P.R. Dec. 1; 1994 P.R.-Eng. 909,527 (P.R. 1994); see also González Figueroa v. J.C. Penney P.R., Inc., 568 F.3d 313, 318 (1st Cir. 2009) (recognizing same). A relative's Article 1802 claim is derivative of the principal plaintiff's claim in that it

---

[8] Renta's claim was also founded on Article 1803, which applies the principle of respondeat superior to Article 1802 tort claims. See P.R. Laws Ann. tit. 31, § 5142.

is premised on some harm to the principal plaintiff, and "if the principal plaintiff's claim fails, so too does the relative's derivative claim." González Figueroa, 568 F.3d at 320 (citing Maldonado Rodríguez v. Banco Central Corp., 138 P.R. Dec. 268, 276 (P.R. 1995)); see also Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 24 (1st Cir. 2009) ("The cause of action is derivative and depends on the viability of the underlying claim of the relative or loved one."). Article 1802 claims brought by family members often seek compensation for emotional harm, see Rivera, 575 F.3d at 24; Santini Rivera, 137 P.R. Dec. at 11, as did Renta's claim in this case.[9]

The district court granted summary judgment for Walgreens on Renta's Article 1802 claim. It explained that both of Pagán's claims, brought under Puerto Rico Law 80 and the FMLA, entitled a successful plaintiff to recover only monetary losses and not compensation for emotional distress. Therefore, it reasoned, "[b]ecause the statutes which Pagán proceeds under do not provide for an award of general damages, his wife is unable to derive a claim for damages which he himself could not receive." The court noted that another federal district court had previously reached

---

[9] The Complaint states that Renta "suffered and will continue to suffer emotional and financial damages." However, the plaintiffs failed to plead any facts showing a financial harm to Renta independent of that to her husband. The district court treated Renta's Article 1802 claim as one seeking compensation for only emotional distress, and we will follow its lead.

the same conclusion, but provided no other authority or explanation for its decision. On appeal, Renta argues that this conclusion was contrary to our decision in González Figueroa and that she was entitled to recover for her emotional distress.

As an initial matter, we note that the court was correct that a plaintiff may not recover damages for emotional distress under the FMLA.[10] See Nv. Dept. of Human Res. v. Hibbs, 538 U.S. 721, 739-40 (2003) ("[T]he cause of action under the FMLA is a restricted one: The damages recoverable are strictly defined and measured by actual monetary losses."). Thus, the question posed is whether the relative of an aggrieved employee may recover damages for emotional distress through a derivative Article 1802 claim where the federal statute under which the aggrieved employee brings his claim does not permit recovery for emotional distress.

Contrary to Renta's assertion, this question was not answered by our decision in González Figueroa. That case presented similar facts -- the family members of an alleged victim of workplace discrimination brought claims under Article 1802 seeking compensation for emotional distress and consequential damages. However, our analysis was limited to whether these claims were

---

[10] The same is true under Puerto Rico's Law 80. Soto-Lebron v. Fed. Express Corp., 538 F.3d 45, 55 (1st Cir. 2008) ("A wrongfully terminated employee cannot recover emotional distress damages for the termination itself [under Law 80]." (citing Porto v. Bentley P.R., Inc., 132 P.R. Dec. 331, 342 (1992))). However, since Pagán voluntarily dismissed his Law 80 claim, we focus on the FMLA claim here.

time-barred.  At the outset, we explained that "[t]his appeal requires us to consider the interplay between the statute of limitations and the maintenance of derivative tort claims brought by relatives of an age discrimination plaintiff," 568 F.3d at 316, and our holding was limited to issues concerning the accrual and potential tolling of the relatives' Article 1802 claims, id. at 321-23.  It is true that the vehicle for the principal plaintiff's claim, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34, does not provide for emotional distress damages, see Collazo v. Nicholson, 535 F.3d 41, 44, 44 n.3 (1st Cir. 2008), but the issue of whether the plaintiffs were entitled to emotional distress damages in light of this fact was not before the court and was not addressed by the decision.  Accordingly, we will not treat González Figueroa as having implicitly decided this issue of Puerto Rico law.

Unfortunately, neither has the Supreme Court of Puerto Rico decided the issue in any translated case identified by the parties.  In Santini Rivera, the court found that family members could bring an Article 1802 claim in circumstances similar to those here and identified the elements of such a claim: "(1) the relatives have allegedly suffered a compensable moral (emotional) harm; (2) the harm was caused by the employer's discriminatory treatment of his employee . . . in such a way that the impact of the discriminatory treatment received by [the employee] affects

-29-

[the relatives] and causes them harm; and (3) the employer committed a tortious act." 137 P.R. Dec. at 11. The court emphasized that the provision was based on general principles of tort liability, explaining that "the sec. 1802 concept of fault is infinitely embracing, as ample and embracing as human conduct is," id. at 8, and that it permitted recovery for "moral (emotional) harm experienced by the persons related by blood ties or by affection and love to the victim or aggrieved party," id. at 10.

While Santini Rivera's reading of Article 1802 is broad, it is important to note that the principal claim from which the relatives' claims derived was based on Puerto Rico's general employment discrimination statute, P.R. Stat. Ann. tit. 29, § 146, which itself permitted recovery for damages caused by emotional distress. The court did not address the question of whether Article 1802 provides a vehicle for a family member to recover damages not available to the employee who suffered discrimination directly, nor have the parties identified any subsequent decision of the Supreme Court of Puerto Rico that has done so.[11]

---

[11] In Santini Rivera, one Justice of the Supreme Court of Puerto Rico, writing separately, noted that family members would not be entitled to bring an Article 1802 claim where the principal plaintiff's claim is under Puerto Rico's wrongful termination statute, P.R. Stat. Ann. tit. 29, § 185. See Santini Rivera, 137 P.R. Dec. at 16. However, this proposition is narrowly addressed to cases involving claims brought under that statute and does not apply to cases in which the principal plaintiff's claim is brought under another Puerto Rico statute or federal law. Regardless, this statement in a separate opinion is not a statement of the court.

Despite the broad reading of Article 1802 provided by Santini Rivera, subsequent decisions of the United States District Court for the District of Puerto Rico have not permitted family members to recover emotional distress damages through a derivative Article 1802 claim when the statute under which the individual directly harmed brings his claim does not permit such damages. In Barreto v. ITT World Directories, Inc., 62 F. Supp. 2d 387 (D.P.R. 1999), the court considered an Article 1802 claim brought by the wife of an individual who alleged dismissal from his employment because of his military status in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-35, and a similar Puerto Rico statute, P.R. Laws Ann. tit. 25, §§ 2001-2093. Reasoning that neither of these statutes permitted recovery of damages for emotional distress, the court dismissed the wife's Article 1802 claim. The court did not provide an extensive explanation of its decision, but simply noted that "it would be ludicrous for plaintiff's spouse to be entitled to greater benefits than [plaintiff] himself would be entitled to." Id. at 394. Subsequently, other decisions of the district court have reached the same conclusion regarding Article 1802 claims derived from a violation of USERRA harming one's relative. See Rivera-Cartagena v. Wal-Mart P.R., Inc., 767 F. Supp. 2d 310, 320 (D.P.R. 2011) (quoting Barreto and dismissing spouse's Article 1802 claim);

Rivera-Melendez v. Pfizer Pharma., Inc., 747 F. Supp. 2d 336, 340-41 (D.P.R. 2010) (citing Barreto and dismissing derivative Article 1802 claim brought by conjugal partnership).

However, these decisions by federal courts are not authoritative statements of Puerto Rico law, and, as far as we can tell, this question remains unresolved by the Supreme Court of Puerto Rico. In light of this uncertainty, we will not encroach on the prerogative of that court by resolving the question ourselves. See VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 3 (1st Cir. 1993) ("Absent controlling state court precedent, a federal court sitting in diversity may certify a state law issue to the state's highest court.").[12] Of course, "even in the absence of controlling precedent, certification would be inappropriate where state law is sufficiently clear to allow us to predict its course." Ropes & Gray LLP v. Jalbert (In Re Engage, Inc.), 544 F.3d 50, 53 (1st Cir. 2008). However, if "the existing case law does not provide sufficient guidance to allow us reasonably to predict" how the state's courts would resolve the question, the prudent course is to certify the question to that court better suited to address the issue. Id. at 57.

_____

[12] We do not sit in diversity, but rather exercise supplemental jurisdiction over Renta's Article 1802 claim as it forms part of the same case or controversy as her husband's FMLA claim. 28 U.S.C. § 1367. Still, it is proper that we exercise the same reluctance to resolve unsettled questions of state law.

We faced a similar issue concerning the scope of Article 1802 in Muñiz-Olivari v. Stiefel Laboratories, Inc., 496 F.3d 29 (1st Cir. 2007). In that case, a former employee and his wife filed a breach of contract suit against the former employer, and both the former employee and his wife sought damages for pain and suffering related to the breach of contract under Article 1802. The appeal required resolution of two unresolved issues of Puerto Rico law: 1) whether a plaintiff could recover damages for pain and suffering in a civil action for breach of contract that involved no claim of violation of anti-discrimination or civil rights laws, and 2) whether such a plaintiff's family member, who is not a party to the contract, could recover pain and suffering damages. Id. at 39-40. We decided that the best course was to certify the questions to the Puerto Rico Supreme Court. That is true here as well.[13]

This issue as to the scope of Article 1802 presents an important question of Puerto Rico law having broad implications on the availability of damages in a federal forum for plaintiffs in Puerto Rico. See In Re Engage, Inc., 544 F.3d at 57 (finding certification appropriate where resolution of state law issues "clearly ha[s] implications which go beyond these parties"). On

---

[13] The Puerto Rico Supreme Court answered both questions in the affirmative. Muñiz-Olivari v. Stiefel Labs., Inc., 174 P.R. Dec. 813 (2008). Unfortunately, other than offering another example of how broadly Article 1802 is construed, this discussion provides little indication as to how it would resolve the issue before us now.

the one hand, vacating the decision of the district court and allowing Renta's claim to proceed extends Article 1802 beyond the scope previously recognized by Puerto Rico courts.  See Hatch v. Trail King Indus. Inc., 656 F.3d 59, 70 (1st Cir. 2011) ("[W]e, as a federal court, have no warrant to extend state . . . law").  On the other hand, this is a question which recurs frequently and which would benefit from a definitive answer.  For that reason, we choose to certify.

**IV.**

For the reasons described, we affirm the judgment of the district court in all respects, save its decision to reject Renta's Article 1802 claim.  We certify to the Supreme Court of Puerto Rico the questions posed by that claim: 1) When an employee's Article 1802 claim is barred because there is a specific federal statutory employment claim, here the FMLA, does the spouse of the employee nevertheless have a cause of action for emotional distress damages under Article 1802 when such relief is not available to the employee under federal law?  2) Does the answer to this question vary depending upon the nature of the underlying federal employment claim?  If so, what are the factors to be considered?

The clerk of this court is directed to forward to the Supreme Court of Puerto Rico, under the official seal of this court, a copy of the certified questions and this opinion, along

with a copy of the briefs and appendices filed by the parties.  We retain jurisdiction pending that court's determination.

> <u>So ordered</u>.