NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12651


RICHARD A. DaPRATO  vs.  MASSACHUSETTS WATER RESOURCES
AUTHORITY.



Suffolk.     April 4, 2019. - June 5, 2019.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher, &
Kafker, JJ.



Massachusetts Water Resources Authority.  Family & Medical Leave
    Act.  Public Employment, Termination.  Employment,
    Termination, Retaliation.  Damages, Emotional distress,
    Liquidated damages, Punitive.  Practice, Civil,
    Instructions to jury.




    Civil action commenced in the Superior Court Department on
December 7, 2015.

    The case was tried before Douglas H. Wilkins, J., and a
motion for judgment notwithstanding the verdict or for a new
trial or remittitur was considered by him.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Meghan L. McNamara (Carolyn Francisco Murphy also present)
for the defendant.
    Robert S. Mantell (David E. Belfort also present) for the
plaintiff.
    John Pagliaro & Martin J. Newhouse, for New England Legal
Foundation & another, amici curiae, submitted a brief.

Patricia A. Washienko & Rebecca G. Pontikes, for Massachusetts Employment Lawyers Association, amicus curiae, submitted a brief.

KAFKER, J.  The Massachusetts Water Resources Authority (MWRA) terminated the employment of an information technology manager, Richard DaPrato, after he went on vacation to Mexico during the final two weeks of a paid medical leave to recover from foot surgery.  A jury found the MWRA liable for a retaliatory termination in violation of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2615 (2012), the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12112 (2012), and G. L. c. 151B, § 4 (16).  The jury awarded $19,777 in "back pay" damages for DaPrato's lost wages and made an "advisory" award of $300,000 in "front pay" for the future loss of his pension benefits.  The jury also awarded $200,000 in damages for emotional distress and $715,385 in punitive damages, and the trial judge awarded $208,443 in liquidated damages and $605,690 in attorney's fees and costs.  The MWRA moved for judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur.  The judge entered remittitur as to the jury's front pay award, reducing it to $188,666, but otherwise denied the MWRA's motion, resulting in total damages of $1,332,271, not including attorney's fees, costs, and interest.

The MWRA now appeals from the judgment below.  It argues that a new trial is warranted because the trial judge, over its objections, gave erroneous jury instructions about the causation standard for an FMLA retaliation claim and failed to give a requested jury instruction concerning the so-called "honest belief" defense to this claim.  The MWRA also contends that the judge erred when, over its objection, he instructed the jury that they could not consider that DaPrato "took or requested [FMLA] leave or spent time recuperating in a particular location or in a particular manner" when determining whether the MWRA had an "independent reason" for terminating DaPrato.  Finally, it contends that the damages award should be vacated or modified with respect to the liquidated, punitive, and emotional distress damages, and recalculated with respect to the front pay award. We affirm the judgment and damages awards.[1]

---

[1] We acknowledge the amicus brief submitted in support of the Massachusetts Water Resources Authority (MWRA) by the New England Legal Foundation and the Associated Industries of Massachusetts, as well as the amicus brief submitted in support of Richard DaPrato by the Massachusetts Employment Lawyers Association.

1.  Facts and procedural history.  We recite the following facts that could have been found by the jury, reserving certain facts for later discussion.[2]

The MWRA is a public authority created by statute to provide water and sewer services to municipalities in Massachusetts.  DaPrato began working for the MWRA in 2004 as a manager in the information technology department.  He received positive performance evaluations, had no disciplinary history, and "loved [his] job."  DaPrato planned to retire from the MWRA in 2019, at age sixty-six.

In January 2015, DaPrato informed the MWRA's human resources department (HR) by e-mail that he was postponing a

---

[2] When reviewing the denial of a motion for judgment notwithstanding the verdict pursuant to Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), we consider "whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the nonmoving party" and view the evidence "in the light most favorable to the plaintiff, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence" (quotation and citations omitted).  Gyulakian v. Lexus of Watertown, Inc., 475 Mass. 290, 295 n.11 (2016).

We review the denial of a motion for a new trial for an abuse of discretion, bearing in mind that a judge should exercise his or her discretion "only when the verdict is so greatly against the weight of the evidence as to induce in his [or her] mind the strong belief that it was not due to a careful consideration of the evidence, but that it was the product of bias, misapprehension or prejudice" (quotation and citation omitted).  Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 127 (1992).

previously scheduled knee surgery and instead planning to take FMLA leave to have an operation to remove a nerve tumor from his right foot.[3]  Based on information received from his surgeon, DaPrato "estimate[d]" that he would need to take FMLA leave during his recovery period from February 6, 2015, the date of the surgery, through March 26, 2015.  DaPrato explained that his surgeon had told him that the "recovery is [three to four] weeks but [he] will not be able to drive as [he] will have a boot on [his] foot for an additional [three to four] weeks."

DaPrato subsequently provided HR with an FMLA application form completed by his surgeon.  In the form, the surgeon twice explained that DaPrato would be able to "transition" to putting weight on his right foot after four weeks.[4]  Additionally, the

---

[3] The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2612(a)(1)(D) (2012), requires a covered employer to provide up to twelve weeks of unpaid leave in a twelve-month period for an eligible employee whose "serious health condition . . . makes the employee unable to perform the functions of the position of such employee."  See 29 U.S.C. § 2611(2), (4) (definitions of "eligible employee" and covered "employer").  The MWRA's "Family and Medical Leave Policy and Procedures" (FMLA leave policy) permitted an eligible employee to apply for "up to [twelve] weeks of unpaid FMLA Leave during any [twelve]-month period for . . . a serious health condition that prevents the employee from performing job requirements."

[4] In a section of the form describing "job functions the employee is unable to perform," the surgeon wrote that DaPrato "must be nonweightbearing to right foot for [four] weeks then transition to WB [weightbearing]."  In a section of the form describing "other relevant medical facts . . . related to the condition for which the employee seeks leave," the surgeon wrote

surgeon estimated that DaPrato would be "[four to six] weeks out of work from date of surgery."  The director of HR relied on this form when approving DaPrato's FMLA leave.

DaPrato had his foot surgery as scheduled on February 6, 2015.  A few weeks later, DaPrato informed the MWRA that he hoped to return to work early because he could "walk around a little without crutches" and was planning to drive his car using his left foot.  DaPrato had returned to work early from previous FMLA leaves, and his hope was to do so in this case as well in order to avoid exhausting his allotted vacation leave time.  HR told DaPrato, however, that he could not return to work without written permission from his doctor.  On February 24, 2015, DaPrato informed the MWRA that he would not be able to obtain his doctor's permission to return to work until his next doctor's appointment on March 26.  In another FMLA leave application dated March 11 and signed by his surgeon, DaPrato requested an additional week of FMLA leave from March 20 until March 26.[5]

---

that DaPrato "must keep his foot elevated + be NWB [nonweightbearing] for [four] weeks --> then transition to WB."

[5] Similar to the earlier FMLA application, this application stated that "patient must be nonweightbearing right foot for [four] weeks then transition to weight bearing."  It also stated "patient . . . must . . . be non weight bearing for [four] weeks transitioning to weight bearing full over next [three] weeks."

When DaPrato determined that he would exhaust his sick time and vacation time before returning to work due to his inability to return until March 26, he spoke to a manager in HR about the MWRA's "salary continuation" policy for providing pay to managers who took FMLA leave due to a "serious health condition that prevents the employee from performing job requirements."[6] DaPrato had first learned about this program in December 2014 from the same manager, when he had informed her about his multiple upcoming surgeries. The MWRA did not have a written application for salary continuation separate from the FMLA leave request forms, and HR applied the same "criteria" as it applied to an FMLA leave request when deciding whether to grant salary

---

This form anticipated DaPrato's return to work as March 27, 2015.

[6] Tracking the language of the relevant provision of the FMLA statute, see note 3, supra, the MWRA's FMLA leave policy stated that an "employee may apply for salary continuation during FMLA Leave only when the employee has a serious health condition that prevents the employee from performing job requirements." In turn, the salary continuation policy provided: "[a]n employee who is seriously ill or disabled, and who has no remaining sick leave balance may apply for salary continuation benefits for a maximum of [twenty-six] weeks. Documentation from a licenced [sic] physician stating that the employee is unable to perform his/her normal duties is required." The policy provided that an employee on salary continuation would receive one hundred percent of his or her pay for the first eight weeks of salary continuation and a descending percentage of his or her salary thereafter. While not reflected in the written policy, the MWRA typically required employees to exhaust vacation time before receiving salary continuation benefits.

continuation. Based on the FMLA forms completed by DaPrato's physician, the HR manager concluded that DaPrato should be approved to receive "salary continuation" benefits while on his FMLA leave.

On March 12, 2015, DaPrato went on a vacation to a beach in Mexico with his family. DaPrato took this trip every year, had booked the travel arrangements well in advance, and had informed his supervisor of the dates of his vacation on multiple occasions.[7] Due to his medical condition, DaPrato stated that he limited the typical activities in which he engaged while on vacation. As discussed infra, at trial the MWRA introduced photographs of DaPrato standing on a boat fishing, including one photograph where he was proudly holding a large fish he had caught, to impeach DaPrato's testimony about his lack of mobility. The MWRA did not, however, possess these photographs when it reached its termination decision. DaPrato returned from his vacation on March 24, 2015.

Several days later, DaPrato contacted HR because his paycheck did not reflect the salary continuation benefits that HR had told him he would receive should he exhaust his allocated sick days and vacation days while on unpaid FMLA leave. HR

---

[7] There was also evidence that DaPrato had told the MWRA's director of administration, one of the managers who interviewed him prior to his termination, that he was going on vacation to Mexico.

subsequently provided DaPrato with $4,614.22 in salary continuation payments for March 16 through March 27, 2015. DaPrato went back to work on March 30, 2015. On April 6, he sent an e-mail message to HR asking for a copy of the salary continuation policy so that he would not encounter any "surprises" about using the policy when he took FMLA leave for his previously postponed knee surgery. The director of HR forwarded DaPrato's e-mail message to an HR manager with the message "is he serious," to which the manager responded "OMG." Despite this and other requests, HR did not provide DaPrato with a copy of the salary continuation policy prior to his termination.

The same day as this e-mail exchange, HR learned that DaPrato had gone on vacation to Mexico while on FMLA leave and receiving salary continuation. The director of HR immediately launched an investigation into the propriety of DaPrato's leave because she did not think an employee "who's seriously ill or disabled would be able to be on a vacation."[8] In the course of

---

[8] The HR director testified as follows when examined by DaPrato's counsel:

Q.: "And is it your testimony that that fact made you suspicious?"

A.: "Which -- which fact?"

Q.: "That he had been on vacation?"

her investigation, the HR director obtained video recordings that depicted DaPrato walking, driving, and lifting luggage out of his car at an MWRA facility on his FMLA leave.[9]  The director of HR believed that these actions were inconsistent with the medical conditions for which DaPrato had been granted FMLA leave and received salary continuation benefits.

---

A.:  "Made me suspicious of what?"

Q.:  "That [DaPrato] was doing something he shouldn't have done?"

A.:  "I didn't think he should be away on vacation, yes, when he received salary continuation benefits."

Q.:  "Right.  But didn't you testify earlier that there is no inconsistency in the salary continuation policy between taking salary continuation and recovering in a vacation location?"

A.:  "Well, I didn't mean that I thought someone should be on vacation.  What I meant was if they needed -- you know, if someone has a sister in Florida and they were unable to work and they needed to be taken care of, there was nothing in the policy preventing them to go to Florida to recover, but I wasn't talking about being on vacation.  I wouldn't think somebody who's seriously ill or disabled would be able to be on a vacation" (emphasis added).

[9] The director of HR reviewed three video recordings obtained from an MWRA facility near Boston's Logan Airport where employees were permitted to park their cars before taking flights.  On March 9, 2015, DaPrato entered the building on crutches when at the facility to attend a meeting.  On March 12, he parked his car and transferred luggage to a taxicab.  On March 24, he put the luggage back in his car and drove away.  In the latter two recordings DaPrato was not using crutches, but he testified that he had a medical boot on his right foot.

On April 8, the HR director presented the video recordings to the MWRA's senior management. The MWRA management instructed the HR director and the MWRA director of administration to interview DaPrato immediately. The interviewers claimed that DaPrato initially denied parking at the MWRA facility or going on vacation. DaPrato contested this account of the meeting: he stated that he attempted to explain that he had tried to come back to work before his vacation and that his conduct on the video recordings was consistent with the limitations described in his FMLA leave forms. The interviewers concluded that DaPrato had "misrepresent[ed] . . . his disability" for which he had obtained FMLA leave and salary continuation. At the end of the interview, the HR director gave DaPrato a letter she had brought to the interview that stated that DaPrato was now "prohibited from entering MWRA property" because he had "been placed on administrative leave with pay effective immediately pending further review of a matter that has come to our attention."

Immediately following the interview, the interviewers reported to MWRA senior management that DaPrato had lied to them about the medical conditions for which he had received FMLA leave and salary continuation benefits and recommended his termination. The interviewers did not, however, present the FMLA leave forms to senior management. Based on the report of

the interview, the MWRA's executive director, with the agreement of the other senior managers, decided to terminate DaPrato's employment.  The director of HR sent DaPrato a termination letter, dated April 9, 2015, informing him that his employment was terminated as of April 10, 2015, due to "[his] misrepresentation that [he was] unable to work from March 12 to March 27, 2015, [his] receipt of extended salary continuation pay to which [he was] not entitled, and [his] failure to be truthful during [his] interview concerning these matters on April 8, 2015."  DaPrato elected to begin receiving his pension, shortly after his termination from the MWRA.

In December 2015, DaPrato brought suit against the MWRA under the FMLA, ADA, and G. L. c. 151B, § 4.  Following trial, the jury returned a verdict in DaPrato's favor on his claims that the MWRA had terminated him in retaliation for his taking FMLA leave for his foot surgery and expressing his intention to take FMLA leave in the future.  The judge and jury awarded damages as described supra.  The judge denied the MWRA's motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial or remittitur, with the exception of remittitur of the front pay damages.  The MWRA appealed from the final judgment, and we transferred the case here on our own motion.

2.  Discussion.  a.  FMLA statute and regulations.  The
central claim in this case is that the MWRA terminated DaPrato
in retaliation for his exercise of his right to take medical
leave under the FMLA.  In relevant part, the FMLA provides that
"[i]t shall be unlawful for any employer to interfere with,
restrain, or deny the exercise of or the attempt to exercise,
any right provided under this subchapter."  29 U.S.C.
§ 2615(a)(1).  It also states that an employer may not
"discharge or in any other manner discriminate against any
individual for opposing any practice made unlawful by this
subchapter."  29 U.S.C. § 2615(a)(2).  A regulation issued by
the Department of Labor further states that the FMLA's
"prohibition against interference prohibits an employer from
discriminating or retaliating against an employee . . . for
having exercised or attempted to exercise FMLA rights," and in
particular explains that "employers cannot use the taking of
FMLA leave as a negative factor in employment actions, such as
hiring, promotions or disciplinary actions."  29 C.F.R.
§ 825.220(c).[10]

To succeed on a claim of retaliation under the FMLA, an
employee "must show that (1) he availed himself of a protected

---

[10] The text of 29 U.S.C. § 2615 only refers to
"discrimination" and "interference," not retaliation.  The
Federal Courts of Appeals differ as to whether a cause of action

right under the FMLA; (2) he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action."  Hodgens v. General Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998).

b.  Errors in jury instructions.  The MWRA claims that it is entitled to a new trial based on several erroneous jury instructions regarding DaPrato's FMLA retaliation claim.[11]  We consider the MWRA's claimed errors in turn.

_____

for retaliatory termination under the FMLA is created by 29 U.S.C. § 2615(a)(2), the antidiscrimination provision; or 29 U.S.C. § 2615(a)(1), the anti-interference provision, and 29 C.F.R. § 825.220(c), a regulation interpreting the interference provision; or both provisions and the accompanying regulation. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 331 & n.2 (1st Cir. 2005) (discussing different approaches and ambiguity of statutory source of this prohibition, while recognizing that 29 C.F.R. § 825.220[c] "unambiguously interprets § 2615 as prohibiting retaliation"); W. Bush & J.M. Paul, The Family and Medical Leave Act, at 10-4 to 10-5 (2d ed. 2017) (discussing different approaches).  Regardless of its origin, a retaliatory FMLA discharge claim is "universally recognized" by the Federal courts. Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 8 (1st Cir. 2012), citing Colburn, supra at 331 n.2.

[11] In a civil trial, a "judge should instruct the jury fairly, clearly, adequately, and correctly concerning principles that ought to guide and control their action" (citation omitted). Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 547 (2014).  The judge is "not bound to instruct in the exact language of the [parties'] requests," however, and "has wide latitude in framing the language to be used in jury instructions as long as the instructions adequately explain the applicable law" (quotation and citations omitted). Kelly v. Foxboro Realty Assocs., LLC, 454 Mass. 306, 316 (2009).  Moreover, an

i.  <u>Jury instruction on standard of causation</u>.  The MWRA
argues that it is entitled to a new trial because the judge gave
an erroneous instruction to the jury concerning the causation
standard required for DaPrato to prove that his termination was
unlawful retaliation for his taking of FMLA leave.[12]  In relevant
part, the judge instructed the jury:

> "Mr. DaPrato must prove that more likely than not he
> was fired because of retaliation.  <u>He must show that</u>

_____

"appellate court considers the adequacy of the instructions as a
whole, not by fragments."  <u>Selmark Assocs. Inc</u>., <u>supra</u>.

[12] The MWRA also argues that the judge's erroneous
instructions regarding DaPrato's FMLA retaliation claim
"tainted" his claims of disability and handicap retaliation
under the Americans with Disabilities Act of 1990 (ADA) and
G. L. c. 151B, § 4 (16).  After reciting the elements of a
retaliation claim under the ADA and G. L. c. 151B § 4 (16), the
judge instructed the jury that the "same principles apply to
[these] claim[s] as to the FMLA retaliation claim" and
"refer[red] [the jury] back to [his] discussion of those
principles."  The MWRA does not otherwise claim error with
respect to the ADA or G. L. c. 151B instructions or claims.

As we discern no reversible error in the FMLA instructions,
we do not address the ADA or G. L. c. 151B claims separately.
We note that the standards for succeeding on a claim of
disability or handicap retaliation under the ADA or G. L.
c. 151B, § 4 (16), are similar to that used for finding
retaliation under the FMLA.  See <u>Mole</u> v. <u>University of Mass</u>.,
442 Mass. 582, 591-592 (2004) (retaliation claim under G. L.
c. 151B requires employee to "show that he engaged in protected
conduct, that he suffered some adverse action, and that a causal
connection existed" [quotation, citation, and footnote
omitted]); <u>Kelley</u> v. <u>Correctional Med. Servs., Inc</u>., 707 F.3d
108, 115 (1st Cir. 2013) (retaliation claim under ADA requires
plaintiff to show that "[1] she engaged in protected conduct;
[2] she experienced an adverse employment action; and [3] there
was a causal connection between the protected conduct and the
adverse employment action" [citation omitted]).

> his taking leave or requesting leave in the future was a negative factor in the MWRA's decision to terminate his employment in the sense that, but for the retaliation, MWRA would not have terminated him. If so, then he has met his burden of proof on the fourth element. . . . If Mr. DaPrato proves that more likely than not MWRA fired him because of retaliation for taking or requesting FMLA leave, then you'll answer yes to question 1 [on the jury verdict form], which asks . . . Did MWRA retaliate against Mr. DaPrato by terminating his employment because he took or requested FMLA leave?" (Emphasis added.)

According to the MWRA, this instruction was erroneous because it led to "impermissible confusion" whether DaPrato's taking of FMLA leave need only be a "negative factor" considered by the MWRA in its termination decision or rather whether retaliation against DaPrato for taking leave was the "but for" cause of his termination.[13] Because the MWRA objected to this instruction at

---

[13] The judge explained that he included the phrase "negative factor" based on our statement in Esler v. Sylvia-Reardon, 473 Mass. 775 (2016), that an "employer may not . . . 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" Id. at 779, quoting 29 C.F.R. § 825.220(c). The trial judge's cautious approach to the negative factor regulation in his causation instruction was appropriate. Our statement in Esler simply made reference to the Department of Labor regulation; it did not provide guidance on how the regulation should be considered in a causation instruction in a retaliation case. The language of the regulation itself is also more general and may simply be designed to provide guidance for how employers, particularly human resources professionals, should treat requests for FMLA leave in the employment context. We could also find nothing in the regulatory history that is informative in this regard.

The case law reflects significant uncertainty in the Federal courts, and no definitive guidance from the United States Supreme Court, about how to consider the Department of

trial, we review for prejudicial error.  See <u>Blackstone</u> v.

<u>Cashman</u>, 448 Mass. 255, 270 (2007) ("An error in jury

instructions is not grounds for setting aside a verdict unless

the error was prejudicial -- that is, unless the result might

have differed absent the error").  We conclude that the judge's

instruction did not result in error, let alone prejudicial

error.

---

Labor regulation in the context of a causation instruction in an
FMLA retaliation case.  See, e.g., <u>Gourdeau</u> v. <u>Newton</u>, 238 F.
Supp. 3d 179, 194 (D. Mass. 2017) (discussing conflicting
interpretations, even within United States Court of Appeals for
First Circuit).  The Federal courts appear divided between those
adopting a "but for" causation test, regardless of the
regulation, and those considering the regulation indicative of a
less demanding, motivating factor test.  Compare, e.g., <u>id</u>.
(regulation not entitled to judicial deference) with <u>Woods</u> v.
<u>START Treatment & Recovery Ctrs., Inc.</u>, 864 F.3d 158, 169 (2d
Cir. 2017) (regulation entitled to judicial deference), and <u>Egan</u>
v. <u>Delaware River Port Auth</u>., 851 F.3d 263, 273-274 (3d Cir.
2017) (same).  See <u>Colburn</u>, 429 F.3d at 335 n.8 ("Whether a
mixed-motive analysis is available at all in an FMLA case for
retaliation is an open question, and we do not resolve it here.
The issue has been adverted to but avoided by three circuits").

    In its brief, the amicus New England Legal Foundation
presents extensive analysis contending that the "but for"
standard is appropriate absent express language to the contrary
in the statute itself and that the Supreme Court will adopt the
"but for" test when the issue is presented to it.  We are,
however, neither prepared nor required to predict how the
Supreme Court will decide this issue in order to decide the
instant case because we conclude that the MWRA received the
benefit of the higher standard and any uncertainty in this
regard.  See <u>ACE Prop. & Cas. Ins. Co.</u> v. <u>Commissioner of
Revenue</u>, 437 Mass. 241, 248 n.8 (2002) ("we are not bound by the
decisions of Federal courts [other than the United States
Supreme Court] on matters of Federal law").

The emphasized portion of this instruction contains the MWRA's requested "but for" standard.  The judge carefully explained the sense in which he was using negative factor in the instruction.  It was not just a motivating factor but instead a "but for" factor, in the sense that "but for the retaliation [for the exercise of a protected FMLA right], MWRA would not have terminated [DaPrato]."[14]  Further clarifying this sense, the judge then reviewed the verdict form with the jury, explaining that the jurors must consider whether "MWRA fired [DaPrato] because of retaliation" and whether it was "more likely than not MWRA fired [DaPrato] because of retaliation for taking or requesting FMLA leave" (emphasis added).  This language applies a "but for" standard of causation.  See University of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 350 (2013), citing Safeco

---

[14] The "but for" portion of the instruction as given is similar to the MWRA's requested instruction that "Mr. DaPrato must show that a desire to retaliate against him was a determinative, or but for, factor in the decision by MWRA to terminate him.  In other words, the plaintiff must prove that, had he not taken the FMLA leave, MWRA would not have terminated his employment."  By contrast, the judge omitted the plaintiff's proposed instruction that the jury need only find that the MWRA's retaliatory motive for DaPrato's taking leave may have been a "motivating factor" among "other, legitimate considerations."

Ins. Co. of Am. v. Burr, 551 U.S. 47, 63-64 & n.14 (2007) ("because of" calls for "but for" causation standard).[15]

In short, in considering the "adequacy of the instructions as a whole," Selmark Assocs., Inc. v. Ehrlich, 467 Mass. 525, 547 (2014), and respecting the "wide latitude" the judge has in framing the instructions (citation omitted), Kelly v. Foxboro Realty Assocs., LLC, 454 Mass. 306, 316 (2009), we discern no error in the judge's causation instruction.

ii. Jury instruction on location or manner of FMLA leave. The MWRA also claims that the judge erred when, over its objection, he instructed the jury: "[DaPrato] has not met this element [i.e., causation] if the MWRA discharged him for independent reasons, even if that discharge occurred during or after his taking of FMLA leave. A reason counts as an independent reason only if it does not include as a negative factor the fact that Mr. DaPrato took or requested leave or spent time recuperating in a particular location or in a particular manner" (emphasis added). The MWRA argues that it suffered prejudice because the instruction prohibited the jury from considering DaPrato's conduct while on vacation during his

_____

[15] Moreover, the jury were instructed to award compensatory damages that DaPrato lost "as a result of MWRA's retaliation" or "as a result of the MWRA's unlawful conduct." The award of damages thus required the jury to find retaliation to be the "but for" cause of DaPrato's termination.

FMLA leave, even though the jury may have thought this conduct was inconsistent with DaPrato's claimed medical condition and thus supplied an independent reason for the MWRA to terminate DaPrato.

Although the wording of this instruction was problematic, we conclude that, in the circumstances of this case, it was not an abuse of discretion and, in any event, was not prejudicial. The purpose of the instruction was curative: the judge determined that it was necessary to minimize the "substantial risk that the jury would be swayed by the MWRA's attempts, through photographs and evidence, to play to the jury's possible resentment . . . against DaPrato for taking a vacation while on FMLA leave." Specifically, the judge had admitted photographs of DaPrato on a fishing trip while on vacation in Mexico during his FMLA leave. The photographs, which depicted DaPrato standing on a boat and holding up a large fish, were admitted, over DaPrato's objection to their potential prejudice, so that during cross-examination the MWRA could impeach DaPrato's account of his mobility while on vacation. The judge concluded, however, that the "jury saw the picture a bit excessively at a time when counsel could have taken it down. . . . I think that was inappropriate." The judge thus decided that he needed to give an instruction explaining to the jury that "you can't penalize someone for going on vacation during FMLA leave."

The judge's instruction was intended to comply with <u>Esler</u> v. <u>Sylvia-Reardon</u>, 473 Mass. 775, 781 (2016).  Indeed, in <u>Esler</u> we emphasized that an employer may not treat the mere fact that an employee went on vacation while on FMLA leave, standing on its own, as grounds for an adverse employment action.  In that case, however, there was no inconsistency between the employee's medical reasons for taking the leave (an anxiety diagnosis) and her conduct on leave (ice skating in New York City).  <u>Id</u>. at 777.  We clarify today that an employer may validly consider an employee's conduct on vacation -- or, for that matter, anywhere -- that is inconsistent with his or her claimed reasons for medical leave, when the employer has such information at the time the employer is evaluating whether leave has been properly or improperly used.

Here, DaPrato took FMLA leave to allow his foot to recover fully from surgery.  Such recovery could take place in a warm climate as well as in a New England winter.  That being said, vacationing while on FMLA leave may take either permissible or impermissible forms.  An employee recovering from a leg injury may sit with his or her leg raised by the sea shore while fully complying with FMLA leave requirements but may not climb Machu

Picchu without abusing the FMLA process.[16]  Careful consideration of the reasons for the medical leave and the activities undertaken, including the timeline for rehabilitation and recovery, are required to determine whether FMLA leave has been abused.  DaPrato's fishing trip raises legitimate questions:  he is seen in photographs standing on a boat and holding a large fish that apparently he had reeled in himself at a time when he was supposedly still recovering from foot surgery.  In this context, the instruction given by the judge is problematic, as the photograph is some evidence that DaPrato may not have been entirely truthful about the state of his injury and his need for FMLA leave.

---

[16] For informative fact patterns, compare, e.g., Esler, 473 Mass. at 777, 781 (no inconsistency between FMLA leave and ice skating where employee out on FMLA leave for anxiety disorder was encouraged by her doctor to engage in pleasurable activities and light exercise to relieve stress), with Sharrow vs. S.C. Johnson & Son, Inc., U.S. Dist. Ct., No. 17-CV-11138 (E.D. Mich. Apr. 12, 2018) (employer had nonretaliatory reason to terminate employee who played nine holes of golf and went "tubing" in river while on FMLA leave for foot injury), and Lineberry vs. Richards, U.S. Dist. Ct., No. 11-13752 (E.D. Mich. Feb. 5, 2013) (granting summary judgment to employer where investigation revealed that employee on FMLA leave for leg and back pain lied about need for wheelchair while taking preplanned vacation to Mexico and employer reasonably relied on other particularized facts, such as Facebook posts of employee riding in motorboat). See Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1266, 1275 (11th Cir. 2017) (overturning grant of summary judgment for employer where evidence was "murky at best" that employee who took FMLA leave for shoulder surgery abused leave by going to amusement park and Caribbean island).

Nevertheless, as discussed supra, the MWRA did not have the photographs when reaching its termination decision. It did not know what he did on vacation in Mexico, just that he had gone on vacation to Mexico. The HR director's statement that she considered all vacations while on FMLA leave impermissible was incorrect as a matter of law. Importantly, DaPrato's FMLA leave certification forms described his foot as steadily recovering, with weight bearing allowed, indicating he could engage in some activity on vacation. Finally, the judge was concerned that the MWRA was appealing to the jury's emotions by highlighting the fishing pictures and not removing them from the jury's sight. We cannot say, in these circumstances, that it was an abuse of discretion to give this instruction to address unfairness that he concluded may have arisen during trial. See Renzi v. Paredes, 452 Mass. 38, 53 (2008) ("well within [judge's] discretion to provide [a] curative instruction" to ensure jury correctly base their decision on evidence); Carrel v. National Cord & Braid Corp., 447 Mass. 431, 447 (2006) (proper for judge to issue instruction that jury consider certain evidence without being influenced by "sympathy, emotion, [or] sentiment").

Finally, even if such an instruction were an error, we conclude that it was not prejudicial. The jury awarded punitive damages because it found the MWRA's conduct outrageous. This award demonstrates that the jury credited DaPrato's account of

his medical condition, and what he said to the MWRA officials when they confronted him, and not the MWRA's. Given the jury's unequivocal decision in favor of DaPrato, we conclude that any error in this instruction would not have prejudiced the MWRA.

iii. <u>Absence of jury instruction on MWRA's "honest belief"</u> <u>for its termination decision</u>. The MWRA further argues that it was error for the judge, over its objection, to decline to provide a jury instruction that "an employer is not liable under the FMLA if it discharges an employee based upon an honest belief that the employee had misused FMLA leave, even if that belief is mistaken."[17] The judge declined to give an "honest belief" instruction on the ground that "an honest but

---

[17] The judge did instruct the jury that they might find the MWRA's termination decision to have been "poor or erroneous" but not an FMLA violation so long as it was not a "pretext for illegal retaliation." He further instructed the jury that the "employer's stated legitimate reason must be reasonably articulated and non-retaliatory but does not have to be a reason that you, the jury, would personally agree with. An employer is entitled to make his own policy and business judgments." As discussed, the jury determined that DaPrato's termination was "because of retaliation for taking or requesting FMLA leave." They thus rejected the possibility that the termination decision was made for valid business reasons rather than serving as a "pretext for illegal retaliation." As the judge explained in denying the MWRA's motion for a new trial, the "MWRA argued this case as an 'either-or' question. Either MWRA fired DaPrato for the reasons it stated, or the reasons were a pretext for discrimination and retaliation. Neither party suggests a third possibility."

unconsciously biased decision would [not] absolve the employer from liability."

Based on the text of the FMLA, we conclude that the judge properly declined to give an honest belief instruction.[18] The statute provides a specific, narrowly defined role for good faith, honest but mistaken beliefs that have a reasonable basis. The FMLA provides that a judge "shall" award

> "an additional amount as liquidated damages equal to the sum of the amount described in clause (i) [("any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation")]; and the interest described in clause (ii), except that if an employer who has

---

[18] Whether or not an employer's "honest belief" is a viable defense to an FMLA claim is another issue that has divided the Federal courts. Some reject it as a defense, at least in the context of an FMLA inference claim; others accept it, at least in the retaliation context. Compare, e.g., Tillman v. Ohio Bell Tel. Co., 545 Fed. Appx. 340, 352 (6th Cir. 2013) ("An employer who honestly, but mistakenly believes that the employee abused his FMLA leave can still be said to have interfered with, restrained, and/or denied the exercise of those rights"), and Colburn, 429 F.3d at 332 ("employer motive plays no role in a claim for substantive denial of benefits"), with Capps v. Mondelez Global, LLC, 847 F.3d 144, 152 (3d Cir. 2017) (where employer alleged to have retaliated against employee "provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge"). Some of those recognizing the defense appear to still require employers to show that their employment decisions were reasonable under the circumstances. See, e.g., Marshall v. The Rawlings Co., 854 F.3d 368, 380 (6th Cir. 2017) ("The honest-belief rule applies where the employer reasonably relied on the particularized facts that were before it at the time the decision was made" [quotation and citation omitted]). Regardless, the United States Supreme Court has not addressed the issue, and, as we have explained, we are not bound by decisions of other Federal courts. See note 13, supra.

> violated [§] 2615 of this title proves to the
> satisfaction of the court that the act or omission
> which violated [§] 2615 of this title was in good
> faith and that the employer had reasonable grounds for
> believing that the act or omission was not a violation
> of [§] 2615 of this title, such court may, in the
> discretion of the court, reduce the amount of the
> liability to the amount and interest determined under
> clauses (i) and (ii), respectively" (emphasis added).

29 U.S.C. § 2617(a)(1)(A)(iii). See Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 14 (1st Cir. 2012) ("To establish good faith under the FMLA, a defendant must show that it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it" [quotation and citation omitted]). The award of multiple damages, unless the employer demonstrates good faith or lack of knowledge that its conduct violated the FMLA, demonstrates that good faith or honest belief is "pertinent only to the question of [the amount of] damages under the FMLA, not to liability." Bachelder v. America W. Airlines, Inc., 259 F.3d 1112, 1130 (9th Cir. 2001).[19] It would not make sense to require an employer to prove that its challenged employment decision was done in "good faith" to avoid mandatory payment of liquidated damages if in fact such a showing would defeat liability entirely. See Bellalta v. Zoning

---

[19] The parties agreed that, in the event of the jury finding the MWRA liable for an FMLA violation, they would obtain a "good faith ruling" with respect to liquidated damages by filing postverdict motions. As discussed infra, the judge concluded that the MWRA had made its termination decision in good faith, but that it lacked reasonable grounds for that decision.

Bd. of Appeals of Brookline, 481 Mass. 372, 378 (2019)
(statutory interpretation must be reasonable and avoid absurd
results).  We thus conclude that the MWRA's requested "honest
belief" instruction was not a correct statement of law.

c.  Damages awards.  The MWRA challenges the awards of
liquidated and punitive damages and damages for emotional
distress.  We find no error in these damages awards and affirm.

i.  Liquidated damages.  The MWRA argues that the judge's
award of liquidated damages should be vacated because the MWRA
honestly believed that DaPrato misused his FMLA leave and had
reasonable grounds for this belief.  As the statute expressly
provides, the FMLA requires a judge to award liquidated damages
in an amount equivalent to front pay and back pay damages,
unless an employer proves that its violation was done both in
"good faith" and on "reasonable grounds," in which case the
award is within the judge's discretion.  29 U.S.C.
§ 2617(a)(1)(A)(iii).  See Pagán-Colón, 697 F.3d at 12 ("an
employer must prove both 'good faith' and 'reasonable grounds'
to escape liquidated damages, and the decision of whether to
award liquidated damages is left to the court").

Here, the judge concluded that he was obligated to award
liquidated damages based on his findings that, although the MWRA
"honestly believed it was complying with the FMLA" when it
terminated DaPrato, it lacked objectively reasonable grounds for

that belief.  The judge found that the MWRA's investigation was objectively unreasonable because it ignored DaPrato's FMLA application and medical records and was grounded in "shock, outrage and offense" at the possibility of further FMLA leave rather than "reasonable discovery and evaluation of the facts." The judge observed that his finding that the MWRA had acted in good faith differed from the jury's finding that it had not done so.

Based on his findings, the judge awarded liquidated damages in the statutorily specified amount.  We will affirm a judge's findings of fact unless they are clearly erroneous.  Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 183 (2013), quoting Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996) ("Findings of fact shall not be set aside unless clearly erroneous . . .").  Because the findings on which the judge based his award were not clear error, we affirm the award of liquidated damages in its entirety.

ii.  Punitive damages.  The MWRA argues that the jury's award of punitive damages should be vacated or remitted because its conduct was neither outrageous nor egregious.  Punitive damages may be awarded "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others" (citation omitted).  Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 107 (2009).  A jury award of

punitive damages will be sustained if it could "reasonably have [been] arrived at . . . from any . . . evidence . . . presented" (citation omitted), id. at 107, and is not so "grossly excessive" as to violate constitutional standards of due process, Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 412-413 (2013), quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562 (1996).

We affirm the award of punitive damages. The jury reasonably could have found the manner in which the MWRA treated a long-time employee with no prior history of misconduct to be egregious or recklessly indifferent. The jury could have found that the MWRA was recklessly indifferent because DaPrato's conduct was not inconsistent with the recovery time frame described in the FMLA application. Also, the MWRA's HR director never presented this information to senior management when recommending termination. She also seemed unaware that an employee could be on vacation and still be eligible for FMLA leave, so long as the activity on vacation was consistent with the reasons for the FMLA leave. Furthermore, the MWRA never checked with DaPrato's doctor to confirm his representations about his medical condition, despite admitting that this was an option. The MWRA also denied DaPrato's request for a copy of the salary continuation policy he was subsequently found to have violated. Additionally, the jury could have found that the MWRA

demonstrated hostility in the internal e-mail messages responding to DaPrato's request for FMLA leave and the manner in which it conducted its investigatory interview of DaPrato.[20]

The ratio of punitive damages ($715,385) to compensatory damages ($616,886) is also reasonable.  See Aleo, 466 Mass. at 417 (upholding punitive damages award with greater ratio of punitive to compensatory damages).  See also Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 503-504 (2012) ("ratio . . . not excessive" where amount of punitive damages award was double that of underlying judgment); Williamson-Green v. Equipment 4 Rent, Inc., 89 Mass. App. Ct. 153, 154 (2016) (upholding award of $3,692,657.40 in compensatory damages and $5,900,000 in punitive damages).  And the deterrence purpose of punitive damages justifies the sum awarded here, particularly because the MWRA is a sophisticated and solvent public employer expected to know and comply with the spirit and letter of the FMLA law.  See Aleo, supra at 412 (deterrence); Labonte v.

---

[20] The jury could also have reached the opposite conclusion on punitive damages.  In the past the MWRA had signed off on DaPrato's requests for FMLA leave without objection, and the jury could have found that the HR manager's "OMG" statement was simply understandable frustration on the part of the MWRA with an employee who made one request immediately after another without appreciating or acknowledging the assistance he had already received.  The jury also had the benefit of the parking lot video recordings, and could have drawn different inferences regarding the state of DaPrato's recovery.  It clearly chose to credit DaPrato's explanation, not the MWRA's.

Hutchins & Wheeler, 424 Mass. 813, 827 (1997) (financial position of defendant may be considered when reviewing punitive damages).  See also Ciccarelli v. School Dep't of Lowell, 70 Mass. App. Ct. 787, 798 (2007) (jury could have found violation of G. L. c. 151B by public employer to be particularly outrageous).

   iii.  Damages for emotional distress.  The MWRA argues that the award of $200,000 damages for emotional distress, as found by the jury and affirmed by the court, should be remitted because it was excessive and not supported by the evidence.  We will affirm such an award unless the court below committed an "abuse of discretion . . . amounting to an error of law" (citation omitted).  Labonte, 424 Mass. at 824.  See Reckis v. Johnson & Johnson, 471 Mass. 272, 299 (2015), cert. denied, 136 S. Ct. 896 (2016) ("award of damages must stand unless . . . to permit it to stand was an abuse of discretion on the part of the court below, amounting to an error of law" [citation omitted]).

   It is an error of law for a court to allow an award of damages for emotional distress that is "greatly disproportionate to the injury proven or represented a miscarriage of justice."  Labonte, 424 Mass. at 824.  See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 404, cert. denied, 546 U.S. 927 (2005) ("general rule" is "that a reviewing court should not disturb a jury's award of damages unless it is clearly excessive in

relation to what the plaintiff's evidence has demonstrated damages to be").

Here, we affirm the award of damages for emotional distress because it was supported by the evidence and not greatly disproportionate to the injury suffered.  DaPrato testified that, due to the termination, "mentally, physically, emotionally, I was a train wreck."  He consulted a doctor for anxiety and experienced migraine headaches and other negative health effects.  Furthermore, he spent three months finding new employment, and due to economic necessity he was forced to alter his retirement plans by making the difficult decision to elect "early" pension benefits.  His subsequent series of new jobs, while higher paying, lacked the job security, paid vacations, and other benefits he enjoyed at the MWRA.

In these circumstances, the jury reasonably could have found that DaPrato experienced emotional distress due to negative health and emotional effects following his termination. See Labonte, 424 Mass. at 824 ("jury reasonably could have concluded that the depression caused by the termination was sufficient to warrant damages for emotional distress"); Dalrymple v. Winthrop, 50 Mass. App. Ct. 611, 620-621 & n.14 (2000) (upholding $200,000 damages award for emotional distress under G. L. c. 151B, § 4, where jury had evidence that wrongfully terminated plaintiff "felt humiliated and went into a

depression").  It was also reasonable for the jury to infer that a long-term employee, nearing retirement age, who "loved his job" and was committed to the water quality mission of the MWRA, would suffer emotional distress from wrongful termination of his employment and the need to change his pension and retirement planning.  See Massasoit Indus. Corp. v. Massachusetts Comm'n Against Discrimination, 91 Mass. App. Ct. 208, 215 (2017) (upholding emotional distress damages award under G. L. c. 151B, § 4, where long-time employee "suffered from anxiety and diminished self-esteem" following wrongful termination); Cariglia v. Hertz Equip. Rental Corp., 343 F. Supp. 2d 50, 56 (D. Mass. 2004) (inferring that "necessity of resorting to retirement funds . . . was a source of considerable emotional distress" for wrongfully terminated employee).  In short, the evidence was sufficient for the jury to find that the emotional injury suffered by the plaintiff was serious.  We thus affirm the award in its entirety.

d.  Calculation of FMLA front pay award.  The MWRA contends that the judge erred in calculating the front pay damages that DaPrato received on account of the diminishment of his pension by his earlier than anticipated retirement. The judge informed the parties that he would receive "an advisory decision from the jury on FMLA, front pay."  This was proper:  as we held in Esler, 473 Mass. at 782, relying on Traxler v. Multnomah County,

596 F.3d 1007, 1012 (9th Cir. 2010), and other Federal cases, "front pay under the FMLA is appropriate for a judge's consideration."  The court in Traxler, in turn, explained that, although "front pay is an equitable remedy," a "trial court, sitting in equity, may nevertheless employ an advisory jury. The ultimate decision, however, rests with the court."  Traxler, supra at 1013.  The award of front pay under the FMLA is an equitable decision that we review for an abuse of discretion. Esler, supra.  We conclude that there was no abuse of discretion.

DaPrato was the beneficiary of a "traditional pension plan" or "defined benefit plan" to which he and the MWRA both contributed.[21]  The amount of the pension was contingent on factors including his retirement age and number of years of employment.  DaPrato planned to begin receiving his pension at age sixty-six, the date of his anticipated retirement; due to his termination, however, he retired at age sixty-two.  DaPrato introduced testimony from an expert in economics and finance to calculate the impact of his earlier than expected retirement on

_____

[21] DaPrato's expert defined a "traditional pension plan" (i.e., a defined benefit plan) as one in which the pension beneficiary receives a pension on retirement calculated according to a certain formula.  He contrasted this kind of plan with a "defined contribution plan," such as a so-called "401(k)" plan, in which contributions go into an individual account belonging to the employee.

the amount of his pension. The expert assumed that DaPrato would receive his pension from the date of his planned retirement through the date of his statistically likely death. He then used the MWRA's "pension calculator" and properly discounted the amount of the pension to present value to arrive at a value of $351,869 for DaPrato's pension losses. In determining front pay damages, the jury were instructed to consider these same factors.[22]

From the $351,869 that DaPrato claimed in front pay damages, the jury and judge deducted the following amounts. First, as instructed by the judge, the jury deducted pension contributions that DaPrato would have otherwise made but did not make due to his earlier than anticipated retirement. The jury deducted $51,869 to arrive at its advisory front pay award of $300,000. The judge observed that the jury's deduction to reflect DaPrato's contributions was "approximate," and

---

[22] The judge instructed the jury to consider, "[f]irst, the date that Mr. DaPrato would've taken retirement if MWRA had not terminated his employment unlawfully; second, Mr. DaPrato's life expectancy expressed in terms of the number of years and months he can reasonably expect to live beyond that retirement date; third, the amount that Mr. DaPrato would've received in pension if MWRA had considered his -- continued his employment through his expected retirement date . . . fourth, the amount of pension that Mr. DaPrato will receive as a result of his . . . firing and early retirement. If this rate is lower than the amount of pension he otherwise would receive -- received, then you may find that Mr. DaPrato suffered front pay . . . damages."

subsequently "reduce[d] the total pension loss by $60,000, resulting in an award of $291,869 before considering the MWRA's additional arguments."[23]  Second, the judge deducted the $103,203 in pension payments that DaPrato received and would receive from the date of his termination until the date of his anticipated retirement.  The judge rejected the MWRA's argument that he should deduct a further $97,867 in so-called "excess" salary between the greater amount that DaPrato earned from short-term contract work he obtained following his termination and the lesser amount that he would have earned by remaining at the MWRA.  The judge ordered a front pay award of $188,666.

We conclude that the judge made the aforementioned deductions properly and did not abuse his discretion when he declined to deduct DaPrato's "excess" salary.  An employee who is wrongfully terminated on account of discrimination is entitled to be made whole.  See Arban v. West Publ. Corp., 345 F.3d 390, 406 (6th Cir. 2003) (in FMLA retaliation case, where plaintiff cannot be reinstated, "the question to be answered is whether front pay damages are needed in a particular case to

---

[23] DaPrato's expert approximated that he did not have to make between $50,000 and $60,000 in pension contributions due to his earlier than anticipated retirement.  The judge's deduction of $60,000, rather than the $51,869 deducted by the jury, reflects the amount that DaPrato's counsel stated in closing argument that the jury should deduct to account for these unmade contributions.

make the plaintiff whole").  See also <u>Avitia</u> v. <u>Metropolitan

Club of Chicago, Inc.</u>, 49 F.3d 1219, 1231 (7th Cir. 1995)

(Posner, C.J.) ("when reinstatement is infeasible, the plaintiff

is free to seek in lieu of that remedy an award of 'front pay,'

designed to put him in the identical financial position that he

would have occupied had he been reinstated"); <u>Blum</u> v. <u>Witco

Chem. Corp.</u>, 829 F.2d 367, 373 (1987) (front pay available under

"make-whole philosophy").  Lost pension benefits are part of the

"make whole" calculation.[24]

The award of front pay "restor[ed] [DaPrato] to the

position [he] would have been in had the discrimination never

occurred" (citation omitted).  <u>Blum</u>, 829 F.2d at 373.  Had he

not been discharged in retaliation for the exercise of his FMLA

rights he would have retired at age sixty-six at a greater

pension.  The retaliation thus caused a "tangible loss"

calculated reasonably and precisely by a financial expert

---

[24] For cases in which courts held as much, see <u>School Comm.
of Norton</u> v. <u>Massachusetts Comm'n Against Discrimination</u>, 63
Mass. App. Ct. 839, 849-850 (2005) (awarding lost pension
benefits in employment discrimination case); <u>Ventresco</u> v.
<u>Liberty Mut. Ins. Co.</u>, 55 Mass. App. Ct. 201, 209 (2002) ("Lost
pension benefits are recoverable in an action under G. L.
c. 151B"); <u>Blum</u> v. <u>Witco Chem. Corp.</u>, 829 F.2d 367, 374 (1987)
("Because of the paramount importance of pension benefits to an
employee's future financial security, it would be unfair to
exclude them from a calculation of front pay" in employment
discrimination case).  See also <u>Haddad</u> v. <u>Wal-Mart Stores, Inc.
(No. 1)</u>, 455 Mass. 91, 102 (2009) (front pay intended to
compensate plaintiff for loss of future earnings caused by
discriminatory conduct, including salary and benefits).

(citation omitted).  School Comm. of Norton v. Massachusetts Comm'n Against Discrimination, 63 Mass. App. Ct. 839, 849 (2005).  Because the judge deducted amounts included in the claimed damages that DaPrato no longer had to pay or had already received, there was no double recovery.

The MWRA claims that the judge nonetheless erred when he declined to offset the "excess" salary from DaPrato's posttermination, short-term contract work against the damages attributable to DaPrato's pension losses.  An employee has a "duty to mitigate her damages by reasonable efforts to secure other employment."  Haddad, 455 Mass. at 102.  In this case, DaPrato properly and successfully mitigated his damages when he sought and achieved other employment and actually earned more than he previously had at the MWRA.  As a result, his backpay award was minimal, just the three months he spent looking for work.  The question then becomes whether the additional amounts he earned above and beyond his former salary should be used to offset his pension amounts.  We conclude that the trial judge was well within his discretion in declining to do so.

In the instant case DaPrato obtained various short-term contract jobs.  This work may have provided him more compensation, but it was less predictable and reliable and thus more precarious.  Unlike at the MWRA, he also received no pension; nor did those employers make contributions to a

"401(k)" or other retirement plan. See Blum, 829 F.2d at 374 ("employee illegally discharged near the end of his working career is particularly vulnerable to suffering economic injury in the form of lost pension benefits"). In these circumstances, it was within the judge's discretion not to offset earnings that exceeded DaPrato's prior salary from the calculation of his lost pension benefits. See id. at 374-375 (employees earning more money at current employers entitled to front pay for pension losses without offsets for these additional earnings where current employers had either no pension plans or inferior pension plans); Ventura v. Federal Life Ins. Co., 571 F. Supp. 48, 50 (N.D. Ill. 1983) ("There is no question that if a plaintiff cannot, in a new job, acquire rights to pension benefits equivalent to what he would have had in the job from which he was wrongfully dismissed, he cannot be made whole for the discrimination unless he is given prospective benefits"). To hold otherwise would run counter to the "make whole" principle of front pay awards, at least when an employee, as here, does not receive any pension benefits from posttermination employment. It was also within the judge's discretion to conclude that in the employment discrimination context, "if there is to be a 'windfall,' such benefit should accrue to the injured party rather than to the wrongdoer." School Comm. of Norton, 63 Mass. App. Ct. at 849, quoting Jones v. Wayland, 374

Mass. 249, 262 (1978).  See Graefenhain v. Pabst Brewing Co.,
870 F.2d 1198, 1210 (7th Cir. 1989) (employer should not receive
"discrimination bonus" [citation omitted]).  We thus conclude
that there was no abuse of discretion and affirm the front pay
award in its entirety.

    3.  Conclusion.  For the foregoing reasons, we affirm the
judgment of the trial court.

So ordered.